UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JERREL PEREZ and JANE DOE,

        Plaintiffs,

                                  Case No. 23-cv-153-pp

    v.

SHAWN GUETSCHOW
and KENOSHA UNIFIED SCHOOL DISTRICT,

        Defendants,

    and

CITY OF KENOSHA,

        Intervenor Defendant.

---

**ORDER GRANTING CITY OF KENOSHA'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 41) AND GRANTING IN PART AND DENYING IN PART DEFENDANTS GUETSCHOW AND KENOSHA UNIFIED SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 54)**

---

On February 6, 2023, the plaintiffs—a father and daughter—filed a complaint alleging that Shawn Guetschow, an off-duty police officer employed by the Kenosha Unified School District (KUSD), used excessive force on plaintiff Jane Doe while intervening to stop a fight between Doe and another student. Dkt. No. 1. The plaintiffs also brought claims under Monell v. Dep't of Soc. Serv's, 436 U.S. 658 (1978), against both KUSD and the city of Kenosha, Wisconsin for failure to adequately supervise, discipline or train their employees, including Guetschow, on the use of force. Id. at ¶¶88–100.

The City of Kenosha moved to dismiss the Monell claim, dkt. no. 12, which the plaintiffs did not oppose, dkt. no. 18, and the court granted the motion, dkt. no. 26, dismissing the city from the case. The city then filed an

1

intervenor complaint seeking a declaratory judgment that Guetschow was acting outside the scope of his employment with the city during the events of described in the complaint and that it has no obligation to indemnify Guetschow. Dkt. No. 33.

The City of Kenosha moved for summary judgment on its claim. Dkt. No. 41. The plaintiffs since have filed a letter stating that they do not oppose the city's motion. Dkt. No. 76. Defendants Guetschow and KUSD filed a motion for summary judgment on the excessive force claim against Guetschow and the remaining Monell claim against KUSD. Dkt. No. 54. That motion is fully briefed. Dkt. Nos. 55, 71, 79. The court will grant the city's motion and will grant in part and deny in part Guetschow and KUSD's motion.

## I.   **Background**

The following facts are undisputed unless otherwise noted.

### A.   Guetschow's Employment with KUSD and the City of Kenosha

The city of Kenosha employed Guetschow as a police officer for approximately six years. Dkt. No. 72 at ¶37; Dkt. No. 75 at ¶8. From Fall 2019 to March 2022, Guetschow also worked part-time for KUSD as an off-duty officer. Dkt. No. 72 at ¶38. Only KUSD high schools (not middle schools) contracted with the Kenosha Police Department have *on-duty* officers assigned to their schools. Id. at ¶132. The Kenosha Police Department approved Guetschow's secondary employment with KUSD. Dkt. No. 75 at ¶41. KUSD compensated Guetschow for the time he worked on campus as an off-duty officer. Id. at ¶48. While working as an off-duty officer, Guetschow was subject to KUSD policies and procedures, including KUSD's policy governing physical restraint in response to student behavior. Id. at ¶¶51–52.

2

The parties agree that Guetschow had received training in the use of force against "vulnerable populations," including children. Dkt. No. 72 at ¶42. The parties dispute whether Guetschow received any formal training from KUSD regarding the off-duty officer role. Id. at ¶44. But Guetschow had intervened in approximately two other student fights while employed with KUSD and during his law enforcement career, had experience using the "three-point ground stabilization technique" to restrain juveniles involved in fights. Id. at ¶¶123, 130.

B.    Events Leading Up to the Fight

In March 2022, plaintiff Jane Doe was a sixth-grade student at Lincoln Middle School in Kenosha. Dkt. No. 72 at ¶1. After school on March 1, 2022, Doe engaged in a fight with LM, another student at Lincoln Middle School, and Doe's friend. Id. at ¶¶2–3, 8. Although Doe testified at her January 15, 2024 deposition that the fight with LM initially was a "play fight," Doe testified that it eventually "turned to serious" when somebody hit someone else too hard, making the recipient of the "hit" angry. Id. at ¶¶13–15. (Doe testified that she did not remember who hit whom too hard. Id. at ¶15.) The fight between Doe and LM ended and both went home. Id. at ¶16. The next day—March 2—Doe was pulled out of class and asked to write a statement regarding the fight. Id. at ¶20. Doe then was suspended for the rest of the day and sent home. Id. at ¶21.

A few days later—March 4, 2022—while Doe was sitting in the lunchroom with other friends, LM and her friends approached Doe's table and spoke to Doe. Id. at ¶¶22–23. Doe testified at the deposition that she did not remember what LM said. Id. at ¶23. LM then returned to her own table and Doe continued speaking with her friends at her table. Id. at ¶¶24–25. LM later

3

returned to Doe's table; the defendants assert that LM asked Doe if Doe would "fight her," while the plaintiffs assert that LM "repeatedly antagonized Jane Doe to fight her even though Jane Doe told her no" and that when Doe said no, "LM began telling Jane Doe to push her." Id. at ¶26. (citing Dkt. No. 65-1 at 10, Tr. p. 34, lines 11-22). The parties agree that Doe initially refused to fight with LM because Doe did not want to get in trouble, but LM continued to ask Doe if she wanted to fight and Doe said she did not. Id. at ¶¶27–28. The defendants assert that LM kept telling Doe to push her, so Doe did push her; the plaintiffs assert that Doe "softly pushed" LM because she was "afraid LM would not stop asking Jane Doe to push her and that she was scared LM was going to push Jane Doe." Id. at ¶¶29–30 (citing Dkt. No. 65-1 at 10, Tr. p. 36, lines 17-25, Tr. p. 37, lines 1-13, Tr. p. 38, lines 12-14).

Two adults intervened and attempted to "pull" the two "off each other," or "separate" them, but the students continued to try to hit each other. Id. at ¶¶33–35. One of the adults was Guetschow. Id. at ¶36. Guetschow was at the school in his capacity as an off-duty officer for KUSD, not as a city of Kenosha police officer. Dkt. No. 75 at ¶8. Guetschow was assigned to supervise the lunchroom at the time of the incident. Dkt. No. 72 at ¶48. Guetschow received a call on his radio from a school counselor, Erin Waynes, asking if anyone was coming to the cafeteria; Guetschow responded that he was on his way. Id. at ¶¶51–52. When he arrived, Waynes advised Guetschow that she was concerned that two students were going to fight. Id. at ¶53. The parties dispute what happened next.

C.    The Plaintiffs' Version of Events

The plaintiffs do not dispute that Waynes and Guetschow watched as LM approached Doe. Dkt. No. 80 at ¶11. But they assert that security camera

4

footage shows that Guetschow had time to intervene before the fight began. Dkt. No. 72 at ¶¶56, 60. The plaintiffs agree that LM began to punch at Doe and that the two students began "flailing their arms." Dkt. No. 80 at ¶13. But they dispute that the video shows a "very violent" fight. Dkt. No. 72 at ¶¶57, 65. The plaintiffs assert that during his intervention, Gretschow "grabbed Jane Doe around the neck at the base of her skull, and, with his hand around the back of her neck, pushed her face into the cafeteria floor causing her body to fall into a semi-prone position . . . ." Dkt. No. 80 at ¶8. They contend that as Guetschow was grabbing Doe, he tripped over LM's feet and fell backward into the cafeteria table, pulling Doe with him. Id. at ¶16. They argue that the video footage shows that Doe was not resisting or attempting to prevent Guetschow from grabbing her. Id. at ¶17. The plaintiffs argue that Gretschow was "looking down at Jane Doe as he gripped the back of her neck at the base of her head and slammed her head into the cafeteria floor." Id. at ¶18. The plaintiffs assert that Guetschow—still gripping Jane Doe's head and neck—pushed his knee onto Doe's neck. Id. at ¶19. They assert that "[b]efore lifting Jane Doe to her fee, as she was still handcuffed, Guetschow forcefully pushed his knee into the back of Jane Doe's neck one last time." Id. at ¶21.

The plaintiffs explained that they retained Police Chief Scott Hilden to review the case. Id. at ¶24. They say that Hilden reviewed Guetschow's actions "both in the context of a police officer employed by a police department and as a police officer employed by the school district." Id. at ¶31. They recount that Hilden concluded Gutschow's use of force "was not reasonable and not necessary" and it "deviated from widely accepted police practices, standards, training, and policies." Id. at ¶32. The plaintiffs state that Hilden opined that Guetschow had "obtained control of Jane [D]oe when he had his right [hand] at

5

the base of her skull and his left hand applying a wrist lock . . . ." Id. at ¶34. According to the plaintiffs, Hilden opined that at that point, Jane Doe "no longer posed a threat to anyone, including the officer, and no additional force was reasonable or necessary." Id. at ¶35. The plaintiffs recount that Hilden stated that there was a "high risk of severe injury" to Doe based on the size differential between the 215-pound Guetschow and twelve-year-old Doe. Id. at ¶37. The plaintiffs argue that Hilden opined that there was no threat of continued resistance when Guetschow placed his knee on Doe's neck. Id. at ¶¶48, 52.

D.    The Defendants' Version of Events

The defendants contend that the fight broke out as Guetschow was "receiving information from MS. Waynes that the two girls were going to fight . . . ." Dkt. No. 72 at ¶54. They maintain that at the time Waynes told him about the fight, Guetschow "had no idea which students were discussing a possible fight or who was going to fight." Id. at ¶55. They assert that "[i]n the time between when Officer Guetschow received the information about a possible fight and when the fight actually started there was no opportunity for Officer Guetschow to give the students verbal commands not to fight." Id. at ¶56. The defendants argue that Guetschow observed a "very violent" fight between the two students and that he "could tell that Jane Doe and LM both had experience with physical altercations due to their lack of hesitation or care for one another or anyone around them." Id. at ¶¶57–58. The defendants state that not only did Guetschow have no opportunity to give the students a verbal command, but that "in his experience, [he] felt that an attempt at verbal commands would not have been effective." Id. at ¶60. According to the defendants, Guetschow "thought that if he did not act immediately to stop the fight that someone could

6

have gotten seriously hurt," and that he was "trying to get control of Jane Doe as quickly as possible because he was worried one or more students would try to jump into the fight." Id. at ¶¶64, 67.

The defendants maintain that while Guetschow was trying to restrain Jane Doe, "she was pulling away and trying to reengage with the other student." Id. at ¶69. They argue that as Doe allegedly was resisting, both Doe and Guetschow "fell and [Guetschow] fell backwards hitting his head against a cafeteria table." Id. at ¶70. They assert that when Guetschow "felt pain in the back of his head he initially thought he was punched by one of the two students." Id. at ¶71. The defendants say that there were other school workers who saw this. Id. at ¶¶72-74.

The defendants say that Guetschow then put Jane Doe on her stomach, but that "she pushed her body onto her right side." Id. at ¶78. They say that at some point, Guetschow "was trying to get Jane Doe into a 'belly-style prone position,' but she resisted his attempt to turn her over on her stomach by not allowing him to roll her torso over." Id. at ¶79. The defendants say that Doe was trying to "turn her head in the direction where the other student was," and that Guetschow "placed his hand on the side of Jane Doe's head to try and stabilize her." Id. at ¶¶81–82. They say, however, that Guetschow recalls "the resistive tension from Jane Doe when she was pushing against him trying to escape from his hold on her." Id. at ¶84. The defendants say that Guetschow then put Jane Doe onto her stomach so that he could apply handcuffs. Id. at ¶86. The defendants reiterate that several KUSD employees witnessed the fight and saw that Doe was resisting Guetschow's attempts to restrain her. Id. at ¶¶136–137, 145. According to the defendants, Guetschow did not use a chokehold on Doe or recall Doe stating that she could not breathe. Id. at ¶¶88-89. They say,

however, that even if Doe had said that she could not breath, "[Guetschow] could not hear it over the loud commotion in the cafeteria." Id. at ¶90. The defendants say that Guetschow could 'feel Jane Doe breathing and could see that she was conscious the entire time they were on the ground together." Id. at ¶91.

The defendants contend that "[a]t one point during his attempted application of the three-point stabilization technique, Officer Guetschow's knee slipped from between Jane Doe's shoulder blade, as she continued to resist and twisted her body to her side." Id. at ¶96. They say that Guetschow realized this. Id. at ¶97. They assert that as soon as he realized his knee had slipped, Guetschow "repositioned his knee to the proper position in between her shoulder blades." Id. at ¶98. They maintain that Guetschow's knee was on the back of Doe's neck for "a matter of seconds." Id. at ¶99.

The defendants concede that the plaintiff's expert, Chief Hilden, opined that what Guetschow did was not a proper application of the three-point stabilization technique. Dkt. No. 80 at ¶51. But they emphasize Hilden also admitted that "had the three-point stabilization technique been applied correctly, it would have been appropriate in this case." Id. The defendants say that once Guetschow had applied handcuffs to Doe, the two stood up and left the cafeteria. Dkt. No. 72 at ¶105.

E.    Aftermath

The parties do not dispute that according to surveillance video, the incident lasted a total of forty-four seconds. Id. at ¶107. They agree that Guetschow did not arrest Doe, draw a weapon, show his badge or otherwise indicate that he was acting as a police officer. Dkt. No. 75 at ¶108. Guetschow took Doe to the vice principal's office, where he removed her handcuffs and Doe

8

was instructed to write a statement about the fight. Dkt. No. 72 at ¶¶108–09. Doe did not tell school administrators she was injured; the plaintiffs argue that this was because Doe "didn't know what to do, really." Id. at ¶110 (citing McGaver Decl., ¶2, Ex. A, at 61:18-24). Later, two police officers came to the office to speak with Doe. Id. at ¶112. Doe did not inform the officers she was injured; the plaintiffs contend that Doe testified she "just wasn't thinking about" her pain even though she was in pain at the time. Id. at ¶¶114-115.

The parties agree that Doe was put in a squad car, taken to the police station and placed in a holding cell. Id. at ¶¶116–17. Doe did not tell anyone at the station that she was injured. Id. at ¶118. She was picked up from the station by her aunt. Id. at ¶119. Doe did not inform her aunt that she was injured; the plaintiffs argue this is because "[i]t didn't come to [her]. [She] didn't know what to say." Id. at ¶120. The defendants argue that if Doe had been in pain or injured, she would have sought medical treatment; the plaintiffs contend that when she "was asked about telling anyone she needed to [g]o to the doctor," Doe testified that she "didn't know how it worked, so [she] didn't know if they could do that or not." Id. at ¶121. The plaintiffs say that Doe did seek medical attention the same day. Id. Doe was suspended for more than a week due to her involvement in the fight and ultimately never returned to Lincoln Middle School. Id. at ¶122.

The parties agree that after the incident, Guetschow was treated by paramedics and taken by ambulance to the hospital for the injury to the back of his head. Id. at ¶124. They agree that Guetschow was diagnosed with a concussion, that he had a severe headache and that he "felt dazed and 'foggy.'" Id. at ¶125. They do not dispute that Guetschow had a headache for at least two weeks. Id. at ¶127. They agree that Guetschow took two weeks off work

9

after the incident. Id. at ¶128. But the defendants argue this was to recover from his injuries, while the plaintiffs contend that Guetschow testified it was for mental health reasons. Id.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or

10

conjecture." <u>Fitzgerald v. Santoro</u>, 707 F.3d 725, 730 (7th Cir. 2013) (quoting <u>Harper v. C.R. Eng., Inc.</u>, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." <u>Fitzgerald</u>, 707 F.3d at 730 (quoting <u>Makowski v. SmithAmundsen LLC</u>, 662 F.3d 818, 822 (7th Cir. 2011)).

## III. City of Kenosha's Motion for Summary Judgment (Dkt. No. 41)

The City of Kenosha argues that it is entitled to a declaratory judgment that Guetschow was not acting in the scope of his employment as a city police officer at the time of the events at issue and so the city has no duty to defend or indemnify him. Dkt. No. 41 at 1. Instead of filing an opposition brief, the plaintiffs filed a letter addressed to the court, stating that they do not oppose the city's motion because Guetschow was acting outside the scope of his employment with the city. Dkt. No. 76. The plaintiffs stated that they had filed a response to the city's proposed findings of fact solely to avoid the appearance of admitting any "overlapping" disputed proposed facts raised by Guetschow and KUSD's motion. <u>Id.</u>

### A. City of Kenosha's Arguments

The city argues that for it to indemnify Guetschow, he must have acted within the scope of his employment as a police officer at the time of the incident. Dkt. No. 42 at 10. The city argues that an officer's "conduct is not in the scope of employment in the context of Wis. Stat. §895.46 if it is different from that which is permitted; far beyond the authorized time or space; or too little actuated by a purpose to serve the employer." <u>Id.</u> (citing <u>Martin v. Milwaukee County</u>, 904 F.3d 544, 553 (7th Cir. 2018)). The city argues that the officer's subjective intent and purpose at the time of his actions is "[p]erhaps

11

the most essential factor" for the court to consider. Id. at 11 (citing Martin, 904 F.3d at 555).

The city argues that Guetschow's subjective intent when he intervened in the fight was "to act as a security provider in furtherance of his employment with KUSD". Id. It asserts that Guetschow subsequently turned Doe over to school staff, released her from handcuffs and left, further demonstrating that he was not acting as a police officer securing a subject. Id. at 12–13. The city points to Guetschow's testimony, in which he stated that he "was off duty" and that he "wasn't an officer in that moment or in that capacity." Id. at 14 (quoting Dkt. No. 65-2 at 12, Tr. p. 44, lines 1-25). The city argues that Guetschow was not wearing his police officer uniform or using any police department equipment (other than his radio), was not receiving any compensation from the city for the time spent on campus and did not arrest Doe, again reflecting that he was not acting as a police officer at the time of the incident. Id. at 15.

The city argues that based on the off-duty officer's job description, Guetschow was fulfilling the job duties of an off-duty officer for KUSD at the time of the fight. Id. at 16. It contends that Guetschow's duties for KUSD included "responding to dangerous student misconduct" and "addressing the school's safety and security concerns," which the city says he was doing by intervening in the fight with Doe. Id. The city contends that Guetschow's intervention in the fight did not serve the city's interests in any way and was outside the authorized time and space of his employment because he was, by definition, an off-duty officer at the time. Id. at 16–17.

B.    Analysis

The undisputed facts establish that Guetschow was not acting within the scope of his employment with the city at the time of the events described in the

12

complaint. Wisconsin follows the Second Restatement of Agency with respect to this question. See Olson v. Connerly, 156 Wis. 2d 488 (1990). It uses the following factors to assess scope of employment:

> (1) Conduct of a servant is within the scope of employment if, but only if:
> > (a) it is of the kind he is employed to perform;
> > (b) it occurs substantially within the authorized time and space limits;
> > (c) it is actuated, at least in part, by a purpose to serve the master, and
> > (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Id. at 498 n.10 (citing Restatement (Second) of Agency §228 (1958)). "Much of the analysis of whether an employee acts within the scope of employment focuses on the employee's intent at the time." Stephenson v. Universal Metrics, Inc., 247 Wis. 2d 349, 359 (Wis. Ct. App. 2001) (citing Olson, 156 Wis. 2d at 497–501).

Guetschow was not acting as a police officer at the time he intervened in the altercation between Doe and LM. He was off duty and outside of the authorized time and space limits of his employment as a police officer. His actions were not undertaken to serve the city as a police officer; as Guetschow testified, he was acting to serve KUSD's purposes in his role as an off-duty officer for KUSD. Guetschow's subjective intent was to perform his duties for KUSD, not the city. The court will grant summary judgment for the city of

13

Kenosha because it is undisputed that Guetschow was acting outside the scope of his employment with the city when he intervened in the altercation.[1]

C.    Declaratory Judgment

The city's intervenor complaint seeks a declaratory judgment that Guetschow is not entitled to indemnification under Wis. Stat. §895.46. Dkt. No. 33 at 5. Section 895.46 of the Wisconsin Statutes states that if a public officer or employee, acting in his or her official capacity, is sued as an individual, and the jury finds that the officer or employee was acting within the scope of his or her employment, the state (or the political subdivision which employees the officer or employee) will pay the damages. Jackson v. Graves, Case No. 14-cv-1206, 2015 WL 5577527, at *4 (E.D. Wis. Sept. 22, 2015) (citing Wis. Stat. §895.46). Because the court has determined that Guetschow was not acting in the scope of his employment with the City of Kenosha at the time of the events in this case, the city has no obligation to indemnify Guetschow under §895.46. The court will grant the city's request for a declaratory judgment that Guetschow is not entitled to indemnification by the city under §895.46.

**IV.    Guetschow & KUSD's Motion for Summary Judgment (Dkt. No. 54)**

Guetschow and KUSD moved for summary judgment on the excessive force claim and the remaining Monell claim. Dkt. No. 54. The defendants argue that summary judgment is proper because Guetschow's actions as a school employee were objectively reasonable, and to the extent that Guetschow was responding to the fight as a law enforcement officer, he is entitled to qualified

---

[1] The city also argues that even if the court were to find that Guetschow was acting within the scope of his employment with the city, summary judgment is appropriate because Guetschow did not commit a constitutional violation and is entitled to qualified immunity. Dkt. No. 42 at 23. Because the court can resolve the motion on the scope-of-employment question, the court will not address the city's other arguments.

14

immunity. Dkt. No. 55 at 2. The defendants also argue that dismissal of the Monell claim is proper because there is no evidence that Guetschow was not adequately trained or supervised when performing his duties at KUSD. Id. at 24–25. The plaintiffs have advised the court that they do not oppose the court granting summary judgment in favor of KUSD on the Monell claim. Dkt. No. 71 at 2.

A.   The Parties' Arguments

The defendants first argue that in an *educational* setting, the applicable standard for assessing whether Guetschow's actions constituted excessive force is whether his actions in seeking to maintain order and discipline were objectively unreasonable. Dkt. No. 55 at 4–5. The defendants argue that, in contrast, in the context of a *law enforcement officer's* use of force in seizing a citizen, the "reasonableness" of the force used depends on the totality of the circumstances at the time the officer applied the force. Id. at 5–7. The defendants assert that Guetschow's actions were "objectively reasonable" both under the standard applicable to force used by school employees and under the standard applicable to law enforcement officers.

The defendants argue that Guetschow's decision to immediately intervene to stop the fight was "a reasonable action to prevent disruptive behavior that could endanger students or staff." Id. at 7–8 (quoting Crecy v. Kankakee School District #111, Case No. 15-CV-1014, 2016 WL 10789394, at *10 (C.D. Ill., June 20, 2016)). The defendants contend that Guetschow observed a "very violent" fight, that he could tell that the two students had experience in physical altercations and that he believed the students could be seriously hurt or even killed if he did not intervene immediately. Id. at 9. They argue that Guetschow also was aware that other students might try to join the

15

fight. Id. The defendants argue that under these circumstances, it was objectively reasonable for Guetschow to intervene immediately without first attempting verbal commands (emphasizing Guetschow's alleged belief that such commands would not have been effective). Id.

The defendants assert that the nature and extent of the force Guetschow used on Doe was reasonable. Id. Reviewing case law, the defendants argue that it is appropriate and not excessive to use force to stabilize and handcuff a resisting individual. Id. at 10–12 (citing Williams v. Brooks, 809 F.3d 936 (7th Cir. 2016); Steinhoff v. Malovrh, Case No. 21-cv-664, 2023 WL 8879954, *1 (W.D. Wis. Dec. 22, 2023)). The defendants emphasize the chaotic nature of the fight, Guetschow's allegations that Doe was resisting his attempts to restrain her, the fall and Guetschow's head hitting the cafeteria table. Id. at 12–13. The defendants detail Guetschow's attempt to apply the three-point stabilization technique; they concede that he admits that his knee slipped from the proper position but argue that Guetschow's knee was on Doe's neck "for a matter of seconds," that it was unintentional and that Guetschow moved his knee as soon as he realized it was out of position. Id. at 14. The defendants argue that even if Doe said she couldn't breathe while being restrained, Guetschow could not hear her over the commotion in the background at that time. Id. They emphasize that the entire interaction between Guetschow and Doe lasted only forty-four seconds. Id. at 14–15.

The defendants also assert that putting Doe in handcuffs was reasonable, because Doe was in the handcuffs only for the short walk from the cafeteria to the principal's office and that Guetschow immediately removed the cuffs once there. Id. at 15.

The defendants argue that as an off-duty officer, Guetschow was not subject to KUSD's policy regarding restraint and seclusion of students. Id. at 15–16. They concede that KUSD policy does not condone "the use of seclusion or restraint by district employees when responding to students." Id. at 15-16. They argue, however, that that policy

> recognizes that it may be necessary for district employees to use reasonable and appropriate . . . physical restraint when a student's behavior presents a clear, present, and imminent risk to the physical safety of the students or others, and it is the least restrictive intervention feasible.

Id. at 16 (citing "KUSD police 5471"). The defendants say that this policy applies only to "covered individuals," which the defendants argue do not include law enforcement officers designated by the district to enforce laws, refer matters to law enforcement and maintain the security and safety of the district. Id. The defendants argue that to the extent Guetschow *was* covered by the policy, a violation of a school policy (or of state law, standing alone) is not a basis for a claim of a civil rights violation under 42 U.S.C. §1983. Id. at 17 (citing Windle v. City of Marion, Ind., 321 F.3d 658, 662-63 (7th Cir. 2003); White v. Olig, 56 F.3d 817, 820 (7th Cir. 1995)).

The defendants argue that as a law enforcement officer, Guetschow is entitled to qualified immunity. Id. at 18. They maintain that to defeat that affirmative defense, the plaintiff must show that Guetschow violated a clearly established constitutional or statutory right by intervening in the fight. Id. at 18–19 (quoting Findlay v. Lendermon, 722 F.3d 895, 899 (7th Cir. 2013)). The defendants contend that the burden is on the plaintiff to show that "the violative nature of particular conduct is clearly established. . . in light of the specific context of the case, not as a broad general proposition." Id. at 20 (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015)). And, they argue, even if the

17

right was clearly established, Guetschow nonetheless would be entitled to immunity if it was "objectively reasonable" for him to believe that his actions were lawful. Id. Relying on Jones v. City of Fort Wayne, Case No. 15-CV-093, 2017 WL 1059015 (N.D. Ind., March 21, 2017), the defendants argue that it is not clearly established law whether an officer may be allowed to apply knee pressure to a suspect's neck while trying to subdue and handcuff the suspect. Id. at 22–23. They argue that the totality of the circumstances shows that Guetschow's actions to subdue Doe and stop the fight were objectively reasonable such that he is entitled to qualified immunity. Id. at 23–24.

As for the Monell claim, the defendants argue that the plaintiff must show a pattern of constitutional violations stemming from KUSD's policies, rather than a single incident. Id. at 24–25 (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985)). The defendants argue that there is no evidence that KUSD acted with deliberate indifference to the constitutional rights of its students, sufficient to support a failure-to-train theory of liability. Id. at 26–27. To the extent that the plaintiff alleges KUSD failed to train Guetschow on the use of force with "school populations," the defendants argue that there was no obligation to retrain Guetschow in such a manner when he already had received adequate training by the Kenosha Police Department on the use of force in general. Id. at 27–28 (quoting Crecy, 2016 WL 10789394, at *14). The defendants contend that there also is no evidence of deliberate indifference regarding KUSD's supervision of Guetschow. Id. at 29, 32.

The plaintiffs respond that the contours of the use of force on an individual who is not resisting arrest are clearly established. Dkt. No. 71 at 14. They argue that an officer cannot continue to use force once the individual is "subdued and complying with an officer." Id. at 16 (citing Strand v. Minchuk,

18

910 F.3d 909, 915 (7th Cir. 2018)). They assert that kneeling on a prone individual's back can "often" constitute excessive force depending on the amount of force the officer applied. Id. at 17 (citing Abdullahi v. City of Madison, 423 F. 3d 763, 771 (7th Cir. 2005)). The plaintiffs argue that chokeholds (including knee to neck chokeholds) are "under most circumstances, unreasonable." Id. (quoting Steinhoff, 2023 WL 8879954, at *9).

The plaintiffs contend that the disputed facts regarding Guetschow's use of force and whether Doe was resisting prevent resolving the case at summary judgment. Id. at 18. They point to the video of the altercation, which the plaintiffs contend shows that Doe was not resisting and that Guetschow used a chokehold on her. Id. at 19. The plaintiffs argue that their expert's opinion supports the contention that continued use of force on a non-resisting individual is improper. Id. at 19–20. The plaintiffs maintain that there is a factual dispute regarding whether Guetschow actually was applying the three-point stabilization technique to subdue Doe, because their expert has opined that Guetschow's actions in performing the technique were "completely wrong." Id. at 21–22.

The defendants dispute that Guetschow's actions constituted a "chokehold." Dkt. No. 79 at 2. They argue that the video footage of the incident is unclear and cannot controvert Guetschow's testimony that he did not intend to place his knee on Doe's neck. Id. They say that even if Doe was not actively resisting Guetschow—a fact the defendants dispute—Guetschow's actions were reasonable. Id. at 3. The defendants distinguish the cases the plaintiffs cited, arguing that in those cases, the defendant officers continued to apply force after the suspects clearly expressed that they were surrendering. Id. at 3–5. The defendants argue that here, Doe did not clearly indicate at any point that

she surrendered, nor did she stop resisting Guetschow. Id. at 5. The defendants argue that the unlawfulness of the force Guetschow used in this situation is not clearly established. Id. at 9.

B.    Monell Claim

A plaintiff seeking to survive summary judgment on a Monell failure-to-train or failure-to-supervise claim must present evidence to support that claim, including evidence demonstrating that "a failure to train or supervise was 'the moving force' behind [the constitutional violation]." Barnes v. City of Centralia, Ill., 943 F.3d 826, 832 (7th Cir. 2019) (quoting Monell, 436 U.S. at 694). The plaintiffs abandoned their Monell claim against KUSD in their brief. Dkt. No. 71 at 2. Because the plaintiff has not argued for or presented any evidence of a failure to train or supervise on the part of KUSD, the court will grant summary judgment in favor of the defendants on the Monell claim.

C.    Excessive Force Claim

1.    *Use of Force*

The Fourth Amendment prohibits "unreasonable" seizures, so "[r]easonableness is always the touchstone of Fourth Amendment analysis." County of Los Angeles, Calif. v. Mendez, 581 U.S. 420, 427 (2017) (quoting Birchfield v. North Dakota, 579 U.S. 438, 477 (2016)). In determining whether an officer's force in seizing someone was reasonable, "[t]he operative question . . . is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" Id. at 427–28 (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)). "The reasonableness of the use of force is evaluated under an 'objective' inquiry that pays 'careful attention to the facts and circumstances of each particular case.'" Id. at 428 (quoting Graham v. O'Connor, 490 U.S. 386 (1989)). "In assessing a claim of excessive force, courts ask 'whether the

officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'" Lombardo v. City of St. Louis, Mo., 594 U.S. 464, 466 (2021) (quoting Graham, 490 U.S. at 397).

"Whether an officer has used excessive force depends on 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Rivas-Villegas v. Cortesluna, 595 U.S. 1, 6 (2021) (quoting Graham, 490 U.S. at 396). Courts also consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; [and] the threat reasonably perceived by the officer." Lombardo, 594 U.S. at 467 (quoting Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)). "And '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Mendez, 581 U.S. at 428 (citing Graham, 490 U.S. at 396). "Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." Id. (quoting Saucier v. Katz, 533 U.S. 194, 207 (2001)).

The parties agree that Guetschow took Doe from a standing position to a prone position on the ground. They agree that Guetschow placed his knee on the back of Doe's neck. They genuinely disagree over just about every other fact material to the excessive force determination. They disagree about "any effort made by the officer to temper or limit the amount of force"—in other words, whether Guetschow had the opportunity to do anything that would have

prevented the fight, or whether anything he might have had time to do would have headed it off. They disagree about the "severity of the security problem at issue"—whether Doe "softly pushed" LM or whether the fight was "very violent." They disagree about the need for the use of force"—again, whether the fight was "violent," as well as whether Doe was resisting. They disagree about whether the "threat" was "reasonably perceived" by Guetschow. They disagree about "the amount of force used"—whether Guetschow pushed Doe's head into the floor, impeded her breathing or had his knee to her neck with force and for how long. They even disagree on the extent of the plaintiff's injury. And both parties refer to, and rely on, the surveillance camera video in support of their version of the facts. The material facts surrounding the excessive force claim are rife with genuine disputes; in most instances, that ends the summary judgment discussion and requires the court to start discussing trial dates.

The court acknowledges that the Supreme Court has held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). In Scott, the "record" that blatantly contradicted the respondent's version of events was a videotape. Id. at 380-81. Unlike the footage in Scott, however, the footage in this case does not "blatantly contradict" either party's version of events. One video shows that Doe was flailing when Guetschow intervened in the fight and that she continued to do so for a few moments after Guetschow took her to the ground. See Dkt. No. 73-7. Only one of the videos shows both Guetschow and Doe at the moment when Guetschow placed his knee on Doe's neck, the point at which the plaintiffs claim that Doe was not resisting and that the defendants assert that

22

she was. See Dkt. No. 73-3. Doe was prone for several seconds before Guetschow placed his knee on her neck. But it appears that Doe may have lifted her head immediately prior to Guetschow placing his knee on her neck. It isn't clear from the video whether Doe was resisting or not at the time Guetschow applied the force to her neck. And Guetschow gave deposition testimony that the placement of his knee on Doe's neck rather than her back was accidental and that he immediately moved his knee when he realized it was out of position. This is not remotely a case where the surveillance camera footage is so clear that it "blatantly contradicts" one party or another's version of events. A factfinder will have to resolve the factual disputes raised by the footage, the testimony and the other evidence.

A reasonable factfinder could conclude that Doe was not resisting, or that if she was, the force used by Guetschow was not reasonable under the totality of the circumstances. The court will deny the defendants' motion for summary judgment as to the excessive force claim.

2. *Qualified Immunity*

"Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." Sutterfield v. City of Milwaukee, 751 F.3d 542, 572 (7th Cir. 2014). "To be 'clearly established,' a constitutional right 'must have a sufficiently clear foundation in then-existing precedent.'" Campbell v. Kallas, 936 F.3d 536, 545 (7th Cir. 2019) (quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)). "Qualified immunity applies unless the specific contours of the right 'were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" Id. (quoting Plumhoff v. Rickard, 572

23

U.S. 765, 778-79 (2014)). Clearly established law "cannot be framed at a 'high level of generality.'" Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)).

> Whether qualified immunity applies turns on two questions: First, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly stablished at the time of the violation. *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (per curiam). These questions may be addressed in either order. *Jones [v. Clark]*, 630 F.3d [677] at 682 [7th Cir. 2011] (citing *Pearson v. Callahan*, 555 U.S. 223, 236-43 (2009)). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted).

Smith v. Finkley, 10 F.4th 725, 737 (7th Cir. 2021) (emphasis in original).

Viewed in the light most favorable to the plaintiffs, the facts describe a possible violation of a constitutional right—the Fourth Amendment's prohibition against the use of excessive force in effectuating a seizure. To determine whether that constitutional right was clearly established at the time of the incident, the court must determine whether "precedent squarely governs the facts at issue, mindful that [it] cannot define clearly established law at too high a level of generality." Id. at 742 (quoting Strand v. Minchuk, 910 F.3d 909, 917 (7th Cir. 2018)). Defining the "clearly established right" with specificity is important, "as it can be difficult to determine how the law on excessive force will apply to a factual situation" given the heavily fact-intensive nature of excessive force claims. Id. An official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Kisela v. Hughes, 584 U.S. 100, 105 (2018) (quoting Plumhoff, 134 S. Ct. at 2023).

24

It is clearly established "that using a significant level of force on a non-resisting or a passively resisting individual constitutes excessive force." <u>Alicea v. Thomas</u>, 815 F.3d 283, 292 (7th Cir. 2016) (citing <u>Rambo v. Daley</u>, 68 F.3d 203, 207 (7th Cir. 1995)); <u>see also</u> <u>Miller v. Gonzalez</u>, 761 F.3d 822, 829 (7th Cir. 2014) ("the law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest"). There are genuine disputes regarding the material facts of whether Doe was resisting and whether the force Guetschow used was reasonable, but at the time of the events that unfolded in the cafeteria, the law was clearly established that an officer could not use excessive force on a non-resisting individual. The record contains evidence that Guetschow *may* have done so. Guetschow is not entitled to qualified immunity.

## V. Conclusion

The court **GRANTS** intervenor defendant City of Kenosha's motion for summary judgment. Dkt. No. 41.

The court **DECLARES** that defendant Guetschow is not entitled to indemnification by the City of Kenosha for any judgment entered against him in this case.

The court **GRANTS** defendants Guetschow and KUSD's motion for summary judgment as to the <u>Monell</u> claim against KUSD. Dkt. No. 54.

The court **DENIES** defendants Guetschow and KUSD's motion for summary judgment as to the excessive force claim against Guetschow. Dkt. No. 54.

The court **ORDERS** that defendant KUSD and intervenor defendant City of Kenosha are **DISMISSED**.

The court will schedule a status conference with the remaining parties to discuss the next steps in the litigation.

Dated in Milwaukee, Wisconsin this 11th day of March, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**